ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

DEC 0 8 2015

JAMES N. HATTEN, Clerk
By: ___ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA *ex rel.* CARDELLIA ANDERSON,

    Plaintiff and Relator,

    v.

LOCKHEED MARTIN CORPORATION,

    Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

**FILED UNDER SEAL PURSUANT TO
31 U.S.C. § 3730**

**Civil Action No.: 1:15-CV-4261**

**\*SEALED\***

**FALSE CLAIMS ACT COMPLAINT**

**JURY TRIAL DEMAND**

## I.    INTRODUCTION

*"I'm continuing to try to ban [cost plus contracts]. There's no reason why all shouldn't be."* **Senate Armed Services Committee Chairman John McCain, December 2014**.

1.

Relator Cardellia Anderson ("Relator") brings this *qui tam* action on behalf of the United States of America ("United States") pursuant to the provisions of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), against Lockheed Martin Corporation ("Lockheed"). This action arises from false claims, false statements, and false records made by Lockheed during its work for the United States

under the Future Combat Systems ("FCS"), the Brigade Combat Team Mobilization ("BCTM"), the Joint Tactical Radio System ("JTRS"), the Geostationary Satellite Communications Control Segment for the Wide Area Augmentation System ("WAAS"), the Airborne Maritime Fixed Joint Tactical Radio System ("AMF"), the Joint Light Tactical Vehicle ("JLTV"), the VH-71 presidential helicopter, Independent Research and Development ("IRAD"), the F-35 Joint Strike Fighter, and the F-22 Raptor (collectively, the "Programs"). By mixing and matching employees and other resources among the Programs, Lockheed inflated its costs, billed those inflated costs to the United States, and hid the true amount of those costs from the United States during contract negotiations.

2.

The Programs comprised several types of contract vehicles: firm fixed price, cost plus, cost plus fixed fee, indefinite delivery/indefinite quantity, and Independent Research & Development. Regardless of contract vehicle, each of the Programs offered Lockheed some level of reimbursements for its costs.

3.

The claims were false and fraudulent because of improper billing and cross-charging on contracts. Consequently, the charges for the services provided (1) were excessive, substantially exceeding the level of legitimate charge that could properly

be imposed under governing federal procurement regulations; (2) were secured in violation of governing federal procurement regulations; and (3) included fees for services that were either not rendered, not rendered in full or not rendered as required by contract or by governing federal regulations, all in violation of 31 U.S.C. § 3729(a)(1).

4.

Unless otherwise stated, the allegations in this Complaint, regardless of verb tense, refer to the period from about 2006 (upon information and belief) to the date of the filing of this Complaint ("relevant period").

5.

Relator's claims, as stated in this Complaint, to the best of Relator's knowledge, are not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding to which the United States is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

6.

Relator is the "original source," as that term is used in the FCA, of the information upon which this Complaint is based. Relator brings this action based on her direct knowledge and, where indicated, on information and belief. None of

the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).

7.

As required by the FCA, 31 U.S.C. § 3730(b)(2), simultaneously with the filing of this Complaint, is provided to the United States a statement of all material evidence and information related to the Complaint. This disclosure statement supports the existence of submission of knowingly false claims for payment and approval, and the knowing making, using, and causing to be made and used, false records or statements material to a false claim by Defendant, under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (B). Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, Relator understands this disclosure to be confidential.

## II.   FEDERAL JURISDICTION AND VENUE

8.

This Court has original federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the federal False Claims Act, and 31 U.S.C. § 3732.

9.

This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant can be found in, resides in, or transacts business in this District. Additionally, this Court has personal jurisdiction over Defendant because acts prohibited by 31 U.S.C. § 3729 were performed by it in this District. 31 U.S.C. § 3732(a).

10.

Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. 1391(b) because Defendant transacts business in this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## III. PROCEDURAL ALLEGATIONS

11.

To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(b)(5), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

12.

Furthermore, to the extent that the allegations or transactions set forth herein are the subject of civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein that are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

## IV. PARTIES

13.

Relator is a citizen of the United States and a resident of the State of Georgia. At times relevant and material to this Complaint, Relator was employed by Lockheed in Marietta, Georgia; Fort Worth, Texas; Owego, New York; and Gaithersburg, Maryland as an Administrative Assistant, Integrator/Project Coordinator, Supplier Diversity Administrator, Subcontracts Administrator, and a Senior Buyer/Planner.

14.

Lockheed is a corporation organized under the laws of the state of Maryland and has its primary business office at 6801 Rockledge Drive, Bethesda, Maryland 20817. Lockheed can be served through its registered agent at CSC-Lawyers Incorporating Service Company, 7 St. Paul St., Suite 820, Baltimore, Maryland 21202.

15.

Lockheed is one of the world's biggest defense contractors. About three-quarters of the company's revenues come from the Department of Defense ("DoD") and military contracts.

16.

Lockheed is a national and international provider of advanced technology and security systems. Lockheed also provides aerospace and defense systems and operates through five business segments: Aeronautics, Information Systems and Global Solutions, Missile and Fire Control, Mission Systems and Training, and Space Systems.

17.

Lockheed's aeronautics division facilities are located in Marietta, Georgia; Fort Worth, Texas; and Palmdale, California.

KH355475.DOCX 5                                  7

18.

Lockheed has contracts to produce many high-profile aircraft for the United States military, including the F-22 fighter jet, the C-130 cargo plane, and the F-35 Joint Strike Fighter. The military relies upon Lockheed to produce high-quality aircraft efficiently.

19.

Lockheed received over $30 billion in government contracts as a prime contractor in 2014 alone, over $10 billion more than its closest competitor.

20.

In particular, the $65 million JLTV Program, procurement number W56HZV09C0109, consists of, approximately, thirty-four contracts between the Army and Lockheed for work primarily in Owego, New York. The first contract was signed on October 29, 2008. The contracts were on a cost plus fixed fee basis.

21.

The $80 million JTRS Program, procurement number FA870904C0011, consists of, approximately, fourteen contracts between the Air Force and Lockheed. The first contract was signed on September 8, 2004. The contracts were on a cost plus fixed fee basis.

22.

The approximately $2 billion VH-71 Helicopter Program, procurement number N0001905C0030, consists of scores of contracts between Lockheed and the Navy for work primarily in Owego, New York.  The first contract was signed on January 28, 2005.  The contracts were on a cost plus award fee basis.

## TRUTH-IN-NEGOTIATIONS ACT

23.

Lockheed has statutory, regulatory, and contractual obligations to disclose truthfully its proposed cost or pricing data, and the basis for arriving at the cost or pricing data, to the United States contract negotiators to ensure that the parties would reach a fair and reasonable price under the Programs.

24.

Lockheed knew that it had these obligations to truthfully disclose accurate cost or pricing data and that the United States negotiators relied on Lockheed to honor its obligations.

25.

More specifically, the Truth-in-Negotiations Act ("TINA"), 10 U.S.C. § 2306a, the Federal Acquisition Regulation ("FAR"), Part 15, and the Programs

required Lockheed to provide cost or pricing data to United States negotiators and to certify that such cost or pricing was "accurate, complete, and current."

26.

TINA provides for a reduction in the contract price if Lockheed's cost or pricing data was not accurate, complete, and current at the time of the negotiations and provides for the doubling of this amount if a contractor knowingly submits false or defective cost or pricing data.

27.

"Cost or pricing data" is defined by TINA, 10 U.S.C. § 2306a(h)(1), as "all facts that, as of the date of agreement on the price of a contract (or the price of a contract modification)..., a prudent buyer or seller would reasonably expect to affect price negotiations significantly."

28.

The United States negotiators had a right to rely on, and did rely on, Lockheed meeting its obligations to truthfully disclose its cost and pricing information. The purpose of requiring disclosure of accurate, complete, and current cost or pricing data is to put United States negotiators on equal footing with the contractor to ensure a fair and reasonable price.

29.

As described below, Lockheed withheld "cost or pricing data" from the United States during the Programs, despite being obligated to disclose such data under TINA.

## PROCUREMENT STATUTES AND REGULATIONS

30.

Government contracting is controlled by the FAR, promulgated by the Federal Acquisition Regulatory Council. 41 U.S.C. § 1303(a). FAR sets forth the requirements binding the executive agencies of the United States and all contractors that provide goods and services to those agencies. 48 C.F.R. § 1.101, *et seq*. Defendant's violations of the FCA specifically involve defense contracting, making relevant the Defense Federal Acquisition Regulation Supplement ("DFARS"), promulgated by the DoD. 41 U.S.C. § 1303(a)(2); *see also* 48 C.F.R. § 201.301(a) (DoD implements and supplements the FAR through the DFARS).

31.

Under the United States Code and the FAR, kickbacks between prime contractors and subcontractors are illegal. 41 U.S.C. § 8701, *et seq*.; 48 C.F.R. § 3.502-2.

32.

Under the FAR, government contractors may receive reimbursement from the United States based on their total cost. Total cost "is the sum of the direct and indirect costs allocable to the contract, incurred or to be incurred." 48 C.F.R. § 31.201-1(a). By extension, "[a]fter direct costs have been determined and charged directly to the contract or other work, indirect costs are those remaining to be allocated to intermediate or two or more final cost objectives." 48 C.F.R. § 31.203(b). But "[i]ndirect costs that meet the definition of 'excessive pass-through charge' in 52.215–23, are unallowable." 48 C.F.R. § 31.203(i).

33.

On information and belief, in the contracts with the United States, Lockheed incorporated or promised to adhere to certain regulatory requirements, including, but not limited to:

a.     48 C.F.R. § 52.215-10(a) ("If any price, including profit or fee, negotiated in connection with this contract, or any cost reimbursable under this contract, was increased by any significant amount because . . . Any of these parties furnished data of any description that were not accurate, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction."); and

b.    48 C.F.R. § 52.215-23(b) ("The Government will not pay excessive pass-through charges.").

34.

Similarly, on information and belief, Lockheed submitted bills governed by regulations containing certifications, including but not limited to, the following:

a.    48 C.F.R. § 15.403-1 ("Certified cost or pricing data."); and

b.    48 C.F.R. § 52.232-16 ("Progress Payments").

## V.    FACTS

## A.    Relator's Knowledge of Lockheed and Background

35.

From 2002 until 2010, Relator worked primarily in three of the four divisions[1] within Lockheed—Aeronautics, Electronic Business Systems, and Information Systems & Global Solutions ("IS&GS").

36.

Aeronautics had approximately $14.9 billion in 2014 sales, including tactical aircraft, airlift, and aeronautical research along with development lines of business.

---

[1] As previously noted, Lockheed now operates in five principal business segments. Aeronautics and IS&GS historically account for nearly half of Lockheed's revenues.

37.

IS&GS had approximately $7.8 billion in 2014 sales, including Command, Control, Communications, Computers, and Intelligence ("C4I"), federal services, and government and commercial IT solutions.   IS&GS provides full life-cycle support and expertise in the areas of software and systems engineering, including capabilities in space, air, and ground systems. In addition, IS&GS provides logistics, mission operation support, peacekeeping, and nation-building services for a wide variety of defense and civil government agencies in the United States and abroad. IS&GS's key programs and activities include the JTRS program.

38.

Relator, in December 2002, was hired by Lockheed as an Administrative Assistant in Marietta, Georgia, and was promoted to Integrator/Project Coordinator in September 2005 working with, in particular, Security and Emergency Services. Soon after, Relator was promoted and transferred to Dallas, Texas.  Relator then took a lateral transfer in December 2006 to Owego, New York, and was promoted to Supplier Diversity Representative/Subcontracts Administrator.   Relator, in August 2008, was promoted to a Senior Buyer/Planner and transferred to IS&GS in Gaithersburg, Maryland.

39.

Relator was employed with Science Applications International Corporation ("SAIC") from June 2010 until October 2011 as a Subcontracts Administrator.

40.

While employed at Lockheed in Owego, New York, as a Subcontracts Administrator/Supplier Diversity Representative, Relator reported to a senior manager of subcontracts supporting direct and indirect activities. Relator supported the VH-71, JLTV, IRAD efforts linked to the VH-71 program, and several prototypes for the JLTV.

41.

Relator's job performance at Gaithersburg garnered praise from her colleagues, including that she was "by far the best Supply Chain Management employee" with whom a colleague had worked, that she "greatly increased the efficiency of [the] engineering efforts," that "[h]er support was nothing short of OUTSTANDING!" and that she "had an upbeat, pleasant attitude that seemed to raise the spirits of the people around her."

42.

While employed at Lockheed in Gaithersburg, Relator accumulated first-hand technical knowledge, management knowledge, and knowledge of Lockheed's

contract management and billing processes.  On the technical side, Relator was the lead planner and buyer for capital projects such as the NexGen Cyber Innovation & Technology Center, Global Combat Support System, and C2AMMO.    This experience also gave Relator insight into advanced command and control systems developed for the United States Marine Corps.  For example, the centerpiece of the Command, Control, Communications, and Computers system was the Command Operations Center for the Marine Air Ground Task Force Command and Control Center.    Further, Relator observed the latest communications and information processing and distribution applications, including image intelligence encompassing ground sensors, GPS cameras operated by patrols, and elevated mast-mounted payloads.

43.

On the management side, Relator worked closely with senior Lockheed officials.  For example, members of Lockheed executive management often held video conferences, and Relator attended many conferences and leadership forums about company affairs, along with panel discussions held in smaller groups by executive leadership.  Relator personally met privately with the COO on numerous occasions.  Relator also led the materials planning and purchasing for the NexGen Cyber Security Center capital project for an executive vice president in

Gaithersburg, Maryland, for which Relator received over $10,000 in recognition for her efforts and an invitation to the president awards. In addition, the Vice President of Global Supply Chain Management and Relator led many strategic project efforts.

44.

On the process side, Relator had responsibility for Lockheed's Systems, Applications & Products business application software solutions database, Lockheed's Costpoint project accounting software, and Lockheed's Mainframe software. This responsibility provided insight into Lockheed's labor, billing, invoicing, forecasting, planning, and technical data.

45.

Also through her positions, Relator had access to billing information, invoices, contract agreements, statements of work, bills of materials, drawings, requests for proposal, requests for quotation, requests for information and other information pertaining to contracts for labor, service, and materials. Hence, Relator became familiar with cost analysis and bid proposals.

## B.    While in Gaithersburg, Maryland, Relator Discovers Improper Mark-Ups on Goods Billed to the United States.

46.

Through her positions, Relator worked with subcontractors to get price quotes and to procure goods for Lockheed.

KH355475.DOCX 5                    17

47.

Throughout the relevant period, after Lockheed procured goods for the Programs from subcontractors, Lockheed marked up the subcontractor price quotes about 10-15%. Without showing invoices, Lockheed would then bill the United States for the marked-up total. Upon information and belief, Lockheed billed for the marked-up totals through the Programs whether or not Lockheed used the goods for cost-reimbursable, direct programs.

C.   **Lockheed Misuses Indirect Personnel That were Not Assigned to the Programs in Owego, New York, and Gaithersburg, Maryland, during 2006-2010.**

48.

While working at Lockheed as a Senior Buyer Planner in Owego, New York, Relator observed that indirect employees who were not assigned directly to the Programs, including herself, worked on the JLTV and VH-71 programs, which also required security clearances.[2]

49.

For example, Relator performed labor for the Programs despite being an indirect employee and unable to charge her labor to the Programs. Lockheed shifted Relator's time to direct employees.

_____

[2] Some of these employees did not have the proper level of security clearances required by the Programs.

KH355475.DOCX 5                          18

50.

Similarly, while working at Lockheed as a Senior Buyer Planner in Gaithersburg, Maryland, Relator observed that several indirect employees were performing direct work on the JTRS and other Programs.

51.

At both Gaithersburg, Maryland, and Owego, New York, Lockheed reallocated the indirect employees' time, including Relator's, to direct employees. Lockheed then billed the direct labor costs to the JLTV program and VH-71 program.

52.

Relator also observed that many Lockheed employees charged their lunch breaks and time spent standing around as direct labor under the Programs. In addition, many Lockheed employees charged time spent on work related to Diversity and Affinity Groups like the African American Employee Network, Faith at Work Network, LGBT, and Latino Professionals as direct labor under the Programs.

53.

As another example, Lockheed would allocate the charges that should have gone to overhead via indirect employees to direct employees working in secured,

classified areas that had already worked forty hours in a week. Thus, the additional hours would accrue at the overtime premium.

54.

Most of the engineers and personnel that were working on indirect projects were also working on IRAD projects. The United States intended for Lockheed to absorb certain IRAD project costs after Lockheed exhausted overhead budgets. Yet Lockheed billed the IRAD time through the cost-reimbursing Programs like the JLTV and received reimbursement from the United States. In short, when capital or overhead budgets were exhausted, Lockheed would dump employees' hours into the Programs because the United States reimbursed the Programs for costs.

55.

An example of a capital project funded by this misallocation scheme is the NexGen Cyber Innovation and Technology Center, a cyber research and development center that addresses worldwide cyber security challenges. While working on the cyber security center and trying to acquire equipment for the project, Relator observed that Lockheed maintained this center by charging indirect employees' labor to overhead budgets on IRAD projects for which Lockheed received cost reimbursement.

56.

Lockheed also purchased equipment and computers for indirect employees that were being used in indirect program offices and steered those costs to the United States through the cost-reimbursable Programs.

57.

Relator and her co-workers were continuously requested to purchase goods and services by a vice president for top secret, direct programs requiring the use of direct, classified employees, which Relator and other employees were not.

58.

Relator advised the Vice President of Global Supply Chain Management and her direct supervisor on numerous occasions that she could not purchase items for a direct program without the proper authorization. These individuals responded that Relator was not being a team player, wrote her up, and stated that she was being insubordinate.

59.

In addition, Relator raised issues about obsolete, damaged, and inferior products and goods[3] being used on programs, such as the JLTV, a vehicle that

---

[3] Lockheed improperly billed the United States for obsolete parts and lifetime buys under, among other programs, the JLTV, VH-71, F-22, and F-35 programs.

flipped over during a media event. Relator would continuously bring up her concerns and was repeatedly encouraged not to do so. Relator was warned by the Vice President of Global Supply Chain Management that she would be terminated. Relator continued to alert Lockheed management to these unethical and fraudulent behaviors and ultimately was fired in 2010 for doing so.

## D. **Lockheed Commingles Project Funding in Owego, New York, during 2006-2010.**

60.

While working at Lockheed as a Senior Buyer Planner in Owego, New York, Relator uncovered that Lockheed refused to absorb its share of the costs on the StratV, a prototype IRAD project for the JLTV. Lockheed did this in three ways.

61.

First, Relator realized she did not have the charge numbers needed for proper cost allocation. When Relator sought the proper charge authorization, Lockheed advised her not to worry about the charge numbers.

62.

Second, after exhausting budgets on the StratV, Lockheed shifted indirect employee labor for the StratV—often sixty hours a week—to the direct Programs.

63.

Third, Lockheed would routinely double bill labor and material by sprinkling indirect hours across the Programs for direct cost reimbursement.

E.    **Lockheed Double Bills the United States From 2008 to 2010**.

64.

SAIC received the FCS contract, which was the United States Army's principal modernization program from 2003 to early 2009. FCS formally launched in 2003 and endeavored to create new brigades equipped with new manned and unmanned vehicles linked by an unprecedented fast and flexible battlefield network. The United States replaced the FCS program with the BCTM program.

65.

On FCS, SAIC worked with the Boeing Company as lead systems integrator, coordinating more than 500 contractors and subcontractors, including Lockheed.

66.

While working as a Subcontracts Administrator for SAIC, Relator witnessed double billing and irregularities in both the award and administration of the contract, including instances of improper or unsupported billing.

67.

In particular, when Lockheed submitted invoices or proposals, Relator witnessed representatives from the lead systems integrator questioning those invoices or proposals and finding overbilling.  Relator was instructed by SAIC and the Boeing Company not to send any invoices to SAIC's billing department for payment because the invoices were overbilled and not accurate.

68.

During FCS, Lockheed offered kickbacks to SAIC and the Boeing Company in return for additional subcontracts or for expedited processing of invoices.  These kickbacks comprised, among other benefits, monetary awards, gifts, vacations, hunting trips, tickets to sporting events, and meals.  Upon information and belief, Lockheed passed the cost of its kickbacks on to SAIC and, eventually, the United States.

69.

Upon information and belief, Lockheed was able to secure payment for many of the invoices and proposals that reflected Lockheed's overbilling.

70.

Throughout the FCS, Lockheed misled the United States about the status of its progress. Lockheed received millions of dollars but never produced a fully operational model.

71.

After the United States terminated the FCS program for convenience in 2009, Lockheed continued to rack up additional FCS costs by producing and shipping more FCS-related goods. Specifically, Lockheed shipped information technology products, including command controllers, to an unspecified research facility.

72.

Upon information and belief, Lockheed received payment for its post-termination work. In fact, Relator witnessed purchase orders that were submitted by Lockheed for work that was never authorized to be performed by the United States. Relator reported Lockheed's post-termination work to the FCS lead systems integrator.

73.

During FCS and, then, BCTM, Relator witnessed that Lockheed neglected to secure the required authorizations needed to perform subcontractor work. Nevertheless, Lockheed indicated it had received verbal approval from various

employees with the lead systems integrator that did not have the purchasing warrant required to approve Lockheed's work.

74.

The DoD terminated for convenience the BCTM program effective September 2011.

75.

After termination of the BCTM program, Lockheed had about $300 million of invoices and purchase orders for which the United States would ultimately pay pending with SAIC and the Boeing Company.  Neither SAIC nor the Boeing Company had authorized Lockheed to perform much of the work reflected in that $300 million.   These purchase orders and invoices were incomplete because they lacked the necessary definitization and ratification.

76.

Lockheed continued to threaten to take SAIC to court if SAIC would not pay or definitize outstanding invoices or purchase orders.  Even after definitizing the invoices and purchase orders and pushing Lockheed to accept a 10% reduction, SAIC and the Boeing Company remained certain that Lockheed still had unexplained charges and overbilling.  Utilizing the BCTM program, Lockheed

continued to double bill and bill work based upon other, pending contract awards outside of the BCTM program.

**F.    Lockheed's Cost-Allocation Machinations Lead to TINA Violations.**

77.

As set out above, Lockheed's double billing, commingling of resources, and misallocation of employees generated improper costs that Lockheed advertised as its new cost basis and for which Lockheed received payment from the United States.

78.

Moreover, in preparing its proposal for the VH-71 and JLTV programs, Lockheed avoided using the normal labor cost-estimate method based on performance history and instead used a theoretical construct known as the "Anderlohr method"[4] to estimate its labor costs.  Lockheed could have used the normal labor cost-estimate method, but the Anderlohr method allowed Lockheed to show higher costs.  After securing a higher cost estimate, Lockheed moved some VH-71 and JLTV operations to Camden, Arkansas, to take advantage of the lower regional labor costs.

---

[4] The Anderlohr method is a way of estimating the lost learning that occurs when there is a line break or other disruptions in manufacturing.

27

79.

Thus, despite TINA's requirements that contractors provide certified "cost or pricing data" to the United States on contracts of a certain value, including "all facts that, as of the date of agreement on the price of a contract [] a prudent buyer or seller would reasonably expect to affect price negotiations significantly," Lockheed failed to disclose its excessive costs as required by 10 U.S.C. § 2306a(h).

## **COUNT ONE**

## **(VIOLATION OF FALSE CLAIMS ACT-- 31 U.S.C. § 3729(a)(l)(A))**

80.

Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

81.

The FCA provides that any person who knowingly presents, or causes to be presented to the United States, a false or fraudulent claim for payment or approval, is liable for (a) three times the amount of the damages sustained by the United States, and (b) civil penalties ranging from $5,500 to $11,000 for each claim.  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

82.

Upon information and belief, Defendant, by and through its officers, agents, and employees, knowingly presented, or caused to be presented to an officer or employee of the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(l)(A).

83.

These claims were false and fraudulent because of improper billing and cross-charging. In addition, the charges for the services provided (1) were excessive, substantially exceeding the level of legitimate charge that could properly be imposed for the services provided under governing federal procurement regulations; (2) were secured in violation of governing federal procurement regulations; and (3) included fees for services that were either not rendered, not rendered in full or not rendered as required by contract or by governing federal regulations, all in violation of 31 U.S.C. § 3729(a)(1)(A).

84.

The false and fraudulent claims were presented, as alleged, by Defendant with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance as to whether they were false.

85.

In paying these claims, the United States relied on these false and fraudulent claims, was ignorant of the truth regarding these false and fraudulent claims, and would not have paid Defendant for these false and fraudulent claims had the United States known of the falsity of the said claims.

86.

As a direct and proximate result of the false and fraudulent claims made by Defendant, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendant, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, *et seq.,* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant presented, or caused to be presented, to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses, which Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA claims for which redress is sought in this Complaint;

(e)     That Relator be awarded the maximum amount allowed to her pursuant to the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## COUNT TWO

## (VIOLATION OF FALSE CLAIMS ACT-- 31 U.S.C. § 3729(a)(l)(B))

87.

Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

88.

Upon information and belief, Defendant, by and through its officers, agents, and employees, knowingly made, used, or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to have these

false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(l)(B).

89.

Defendant knowingly used false records or false statements that were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the United States.

90.

Defendant's materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment that explicitly and/or impliedly attested that they had rendered services to their clients consistent with rules and regulations when, in fact, the services for which claims were submitted (a) were awarded in violation of governing federal regulations, including the FAR or (b) were either not rendered, or not rendered in full, or not rendered as required by contract and governing federal regulations.

91.

These said false records or false statements were made, used, or caused to be made or used, with Defendant's actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

KH355475.DOCX 5                                                    32

92.

As a direct and proximate result of the false and fraudulent claims made by Defendant, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA for each such violation.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendant, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained because of the false claims and fraud alleged within this Complaint, as the FCA, 31 U.S.C. § 3729, *et seq.,* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendant presented to the United States;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses, which Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the FCA claims for which redress is sought in this Complaint;

(e)     That Relator be awarded the maximum amount allowed to her pursuant to the FCA; and

(f)     That this Court award such other and further relief as it deems proper.

## JURY TRIAL DEMAND

Relator demands a trial by jury of all claims asserted in this Complaint.

Respectfully submitted this 8th day of December, 2015.

> */s/ Zahra S. Karinshak*
> Zahra S. Karinshak
> Karinshak@khlawfirm.com
> Georgia Bar No. 407911
> Cameron W. Ellis
> Ellis@khlawfirm.com
> Georgia Bar No. 974199

KREVOLIN & HORST, LLC
1201 W. Peachtree Street, N.W.
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)
*Counsel for Relator*